**Opinion filed June 24, 2010**



## In The

# Eleventh Court of Appeals

_____

### No. 11-09-00336-CV

_____

## WORK & REHAB, L.L.C., DWAIN KLOSTERMAN, O.T.
## D/B/A BUBBA KLOSTERMAN, AND DONNA WALLS, O.T., Appellants

### V.

## JANICE STEVENS, INDIVIDUALLY AND AS ADMINISTRATRIX
## OF THE ESTATE OF MARK D. STEVENS, DECEASED, ET AL, Appellees

**On Appeal from the 259th District Court**

**Jones County, Texas**

**Trial Court Cause No. 21,869**

### M E M O R A N D U M   O P I N I O N

The trial court denied appellants' motion to dismiss this health care liability claim. We reverse and remand.

Appellees allege in their pleadings that Mark D. Stevens injured his back while bailing hay at his job. They also allege that Dr. James D. Key treated Stevens for his injuries. That treatment involved the placement of screws in Stevens's back. Stevens received insurance benefits for a period of time. At some point in time, the insurance carrier notified Stevens that he

had to submit to a Functional Capacity Evaluation (FCE). To that end, Stevens saw occupational therapists Dwain Klosterman and Donna Walls, employees of Work & Rehab, L.L.C. Although disputed by appellants, it is the position of appellees that surgical hardware in Stevens's back shifted during the course of this evaluation. Appellants take the position that the evaluation was terminated early because of Stevens's elevated blood pressure and that he never reached the physical part of the evaluation.

Appellees maintain that, as a result of the FCE, Stevens was in severe pain and that he had increased the dosage of OxyContin that previously had been prescribed for him. Some six months after the FCE, Stevens died from "aspiration of vomitus" brought about by "Oxycodone and Diazepam intoxication."

Appellees brought this health care liability claim to recover damages, including those connected with increased prescription medication, that they assert were the result of the FCE.

In connection with this claim, appellees filed a report from Dr. Key, an orthopedic surgeon. They also filed a report from Paul A. Fontana, an occupational therapist. Appellants objected to both reports claiming that they were insufficient under the provisions of TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b) (Vernon Supp. 2009). Appellants also took the position that the insufficiencies in the reports were such that they were incurable, and they wanted the trial court to dismiss the claims. The trial court disagreed and denied the motion to dismiss.

In one issue, appellants reassert their claim that the expert reports were insufficient and incurable and that the trial court erred when it held otherwise.

We review a trial court's order on a motion to dismiss under an abuse of discretion standard. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877 (Tex. 2001); *Maxwell v. Elkins*, 197 S.W.3d 858, 861 (Tex. App.—Eastland 2006, pet. denied). In that review, it is necessary for us to determine whether the trial court acted in an unreasonable or arbitrary manner and without reference to any guiding rules or principles. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003) *Maxwell*, 197 S.W.3d at 861. In matters committed to a trial court's discretion, we will not substitute our judgment for that of the trial court. *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992). A trial court does not abuse its discretion simply because it decides a discretionary issue in a manner differently than would the appellate court. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

2

A claimant in a health care liability claim must timely file and serve on each party, or on a party's attorney, an expert report or reports for each physician or health care provider against whom a liability claim is asserted. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (Vernon Supp. 2009). The term "expert report" means:

> [A] written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (Vernon Supp. 2009).

The report must represent an objective good faith effort to comply with the definition of an expert report. Section 74.351(r)(6). Before a report will constitute an objective good faith effort to comply with the statute, it must provide enough information to inform the defendant of the specific conduct that the plaintiff has called into question. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). Further, the report must contain enough information to provide a basis for the trial court to conclude that the claim has merit. *Id.*

In determining whether an expert report constitutes a good faith effort to comply with the statute, a trial court is limited to the four corners of the report and may not draw any inferences. *Palacios*, 46 S.W.3d at 878-79. However, separate reports may be considered together to determine whether there has been a good faith effort to comply with the statute. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i) (Vernon Supp. 2009).

The report must contain a fair summary of the expert's opinions as of the date of the report as to the applicable standard of care; the manner in which the care that was rendered failed to meet that standard; and the causal relationship between that failure and the injury, harm, or damages claimed. Section 74.351(r)(6). While a plaintiff need not marshal all of its proof, the expert report must include the expert's opinion on each of those elements. *Id.* The expert must state more than bare conclusions as to those elements and must link his conclusions to the facts. *Bowie Mem'l Hosp.*, 79 S.W.3d at 52. In his report, the expert must do more than provide insight into the claim. *Id.*

If a proper expert report has not been timely served, the trial court shall, upon motion of the affected physician or health care provider, award such party reasonable attorney's fees and

3

costs of court and shall dismiss the claim with prejudice. Section 74.351(b). The trial court may, however, if elements of a report are found deficient, grant one thirty-day extension so that the claimant might cure the deficiency. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c) (Vernon Supp. 2009).

We first examine the report authored by Dr. Key. Appellants do not attack Dr. Key's qualifications. In this court, they direct their sole complaint at Dr. Key's failure to address causation in an adequate manner.

Dr. Key was the surgeon who placed screws in Stevens's back when Stevens was injured while baling hay. He reports that Stevens lived with severe pain from the time of his injury on June 3, 2005, to the time of his death in September 2007, with the exception of a short period of time post-surgery.

Dr. Key reports that "one or more" of the screws he had placed in Stevens's back became loosened during the FCE. Although he reports that Stevens was taking "a reasonable amount of valium" for anxiety and muscle relaxation "without any side effects for quite some time," Dr. Key also states that the pain from the nerve injury caused from the loosened screw or screws resulted in Stevens increasing his intake of OxyContin. Dr. Key notes in his report that OxyContin is highly addictive and that "Mr. Stevens had a known sensitivity to this medication." Dr. Key refers to the results of an autopsy performed on Stevens. The stated cause of death was "Oxycodone and Diazepam intoxication and aspiration of vomitus." The oxycodone (OxyContin) level was three times the maximum therapeutic level.

Dr. Key's entire report is premised upon his assumption that "one or more" of the screws had become loosened because of the stressful nature of the FCE. However, one cannot tell from the report how Dr. Key knew that one or more of the screws had loosened. While he describes the type of pain that is typically associated with loosening of surgically implanted hardware and while he states that Stevens suffered from pain, he never reports that he or anyone else examined or saw Stevens after the date of the FCE in connection with the hardware in his back. He refers to an earlier "post-surgical follow-up," but no others after the FCE. As we have noted, we are bound to review the expert report within its four corners. When we limit our examination to the four corners of the report, Dr. Key's statement that "one or more screws" were loosened is speculative and conclusory.

4

Appellants also attack the report authored by Fontana, an occupational therapist. We note that they make no claim that Fontana is not qualified to address causation. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(C) (Vernon Supp. 2009) (physician to give opinion on causal relationship between injury, harm, or damage, and departure from standard of care). We also note that appellants have made no claims here regarding Fontana's comments on the standards of care or the breach of those standards. Rather, the argument is that Fontana fails to show a causal link between their involvement in the FCE and Stevens's death.

Again, we are confined to the four corners of the report. *Palacios*, 46 S.W.3d at 878. Fontana's report suffers from the same defect as Dr. Key's report. Fontana does add the additional note that, at the time of the FCE, Stevens was six months post-lumbar fusion (during which procedure nine screws were placed in Stevens's back). He also notes that Stevens was three and one-half months post-cervical fusion (during which procedure six screws were placed in Stevens's back). He opines that he "would conclude that the activities the therapists had him perform during the 2½ hours they worked with Mr. Stevens resulted in a movement in the screws, that resulted in the significant increase in pain the therapists report."

Fontana bases his opinion, in part, upon the report of Dr. Key. Fontana's opinions were based on the speculative conclusion that some one or more of the fifteen screws to which he referred shifted during the FCE and caused Stevens's pain to increase. As with Dr. Key's report, the trial court would have to go outside the four corners of the report to make that determination, and that it cannot do. *Id.*

Because the basic premise of Dr. Key's report – that one or more screws were loosened in Stevens's back – is speculative and conclusory, it does not provide a basis for the trial court to conclude that the claim has merit. *Bowie Mem'l Hosp.*, 79 S.W.3d at 52. Fontana's report suffers from the same defect as Dr. Key's report, and it does not provide a basis for the trial court to conclude that appellees' claims have merit. *Id.*

Neither Dr. Key's report nor Fontana's report represents an objective good faith effort to comply with the definition of an expert report. Section 74.351(r)(6). We sustain appellants' sole issue as to all of appellees' claims.

We reverse the judgment of the trial court and remand this case to the trial court so that it might determine whether to grant a thirty-day extension so that appellees might attempt to cure

the deficiencies in the reports.  Section 74.351(c); *Leland v. Brandal*, 257 S.W.3d 204, 205 (Tex. 2008).

JIM R. WRIGHT

CHIEF JUSTICE

June 24, 2010

Panel consists of:  Wright, C.J.,
McCall, J., and Strange, J.

6